T.C. Memo. 1999-377

UNITED STATES TAX COURT

BTR DUNLOP HOLDINGS, INC.
AND SUBSIDIARIES, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 24140-97.                    Filed November 15, 1999.

<u>Michael F. Solomon</u>, <u>Clifton B. Cates, III</u>, <u>Alan W. Granwell</u>, and <u>Dirk J.J. Suringa</u>, for petitioner.

<u>Alan R. Peregoy</u>, <u>Gary D. Kallevang</u>, and <u>Judith C. Cohen</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

COHEN, <u>Chief Judge</u>:  Respondent determined a deficiency of $11,202,042 in petitioner's Federal income tax for 1989.  The issues for decision are as follows:

(1) What was the value of Schlegel U.K. Holdings, Ltd. (Schlegel UK), and Schlegel GmbH on July 1, 1989, and November 30, 1989, respectively, for purposes of section 311(b) and section 482 and

(2) what was the Schlegel Corporation's adjusted tax basis in Schlegel GmbH on November 30, 1989.

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

FINDINGS OF FACT

Some of the facts have been stipulated, and the facts set forth in the stipulation are incorporated in our findings by this reference.

Schlegel Corporation

Schlegel Corporation is a New York corporation that was formed on August 10, 1900. Its primary businesses were the production of automotive, building, and industrial seals, and its subsidiaries included Schlegel UK and Schlegel GmbH. During the relevant period, Schlegel Corporation had manufacturing facilities in 12 countries; design centers in Bardon Hill, England, and Detroit, Michigan; and technical centers in Bardon Hill, England, and Rockford, Tennessee. The technical centers

and design centers worked closely with each other, exchanging ideas and information about new technology.

The most significant and profitable technology within Schlegel Corporation was wire carrier, a wire-knitted textile device for stiffening and giving shape to automotive seals. Wire carrier was a preferred attachment medium for automotive seals and weather stripping throughout North America and Europe. Wire carrier was manufactured at the South Carolina division of Schlegel Corporation and at Schlegel Ireland, and it was protected by a number of patents, including the original patent and several subsequent "enhancement patents". Although the original wire carrier patent had expired by 1989, the enhancement patents were still in effect in that year. All of the patents including patents pertaining to wire carrier were owned by Schlegel Corporation.

Schlegel UK

Schlegel Holding Company was a subsidiary of Schlegel Corporation that owned all of the stock of Schlegel UK. Schlegel UK had two separately managed operating divisions: automotive and building products. The automotive division had two manufacturing plants, located in Leeds, England, and Coalville, England, and both plants produced and supplied car manufacturers with seals for car doors, trunks, and windows. The Schlegel UK building products division operated a single manufacturing plant

in Henlow, England, that produced seals for building windows and doors.

Schlegel UK-Leeds was a relatively small facility that produced only plastic automotive seals. Schlegel UK-Coalville was a much larger, more modern plant that produced both extruded rubber and plastic automotive seals. The primary customers of Schlegel UK were Rover, Ford, and Jaguar, and the business with Rover and Ford accounted for 60 to 70 percent of the business of the automotive division. In 1989, Schlegel UK-Coalville was experiencing adequate growth, but there was concern about the continued viability of Schlegel UK-Leeds. Schlegel UK-Leeds was later closed.

Schlegel UK-Coalville did, however, experience some problems in 1989 finishing seals manufactured for Rover. Rover required Schlegel UK-Coalville to mold corners of the rubber seals in the shape of apertures to which the seals would be affixed. The Rover contract also obligated Schlegel UK to provide a new kind of window seal called "sprayed-on slip coat", which Schlegel UK had no experience producing. Schlegel UK-Coalville experienced manufacturing problems with these processes, increasing labor costs and capital expenditures for new injection molding presses.

Schlegel UK did not make wire carrier and had no direct or indirect ownership interest in the divisions of Schlegel Corporation that manufactured wire carrier. Rather, Schlegel UK

purchased wire carrier from Schlegel Ireland and incorporated it into the automotive seals it manufactured. Schlegel UK purchased approximately 35 to 40 percent of the wire carrier produced by Schlegel Ireland, and those purchases accounted for approximately 25 to 30 percent of the total raw material costs in the Schlegel UK automotive division.

Schlegel Corporation licensed to Schlegel UK additional technology that was essential to the manufacture of most of the products in the automotive and building products divisions, and Schlegel UK paid royalties to Schlegel Corporation for the use of this technology. The standard royalty rate was 5 percent of the selling price of products using the technology.

Schlegel GmbH

Schlegel GmbH was also a subsidiary of Schlegel Corporation. It was formed under the laws of the former Federal Republic of Germany and was acquired by Schlegel Corporation on August 22, 1972. The business of Schlegel GmbH was divided into two separate divisions: 75 percent automotive parts manufacturing and 25 percent building products manufacturing. The automotive division of Schlegel GmbH had five main customers that were the largest German automotive producers. While most of the market for German automotive seals in 1989 consisted of rubber-based seals, Schlegel GmbH produced only plastic automotive seals.

Schlegel GmbH did not own any of the patents, processes, or other intellectual property that it used to manufacture its products.

Schlegel GmbH entered into a silent partnership agreement with Schlegel Corporation in December 1981. The partnership agreement provided terms for a contribution of 10 million Deutsche marks from Schlegel Corporation to Schlegel GmbH. Subsequent amendments were made to this agreement, extending it through December 18, 1990.

Schlegel GmbH had its lone production facility in Hamburg, Germany. This factory was built in 1972, and Schlegel GmbH had experienced problems with the foundation of the building since the mid-1970's. The floor on one end of the factory was sinking due to the settling of the soil beneath. This sinking occurred at an approximate rate of 3 centimeters per year, resulting in an approximate total sinkage for some parts of the floor of 50 centimeters by 1989. The sloping floor posed potential production problems in addition to safety concerns. Environmental contamination was also discovered under the factory in 1988.

Schlegel GmbH management was aware of these problems but did not take significant steps to stop the floor from sinking until 1990 and 1991. Those attempts were unsuccessful. In addition, an adjoining warehouse was subsequently built with an entirely different support structure that required floor support pilings

to be inserted between 10 and 17 meters below ground. It was estimated that it would cost $1.4 million to level and reconstruct the factory floor. BTR Dunlop, Inc. (BTR Dunlop), was not made aware of these problems before it purchased Schlegel Corporation in 1989.

Economic Conditions

In mid-1989, the U.K. economy was slowing, following a long period of growth that began in the early 1980's. Gross National Product growth peaked in 1987 at a rate of 4.7 percent and declined to 4.3 percent in 1988. This trend was expected to continue for the following 2 years with a recovery anticipated in 1991 or 1992. In 1989, the U.K. automotive industry was, however, in a position to benefit from the impending European community integration set to occur at the end of 1992. There was concern that the resurgence of automobile production might not help automotive component producers because many automobile manufacturers in the United Kingdom were using components from abroad. The U.K. construction industry had experienced significant growth in the years leading up to 1989, but, due to a rise in mortgage interest rates, this trend was expected to decline.

The economic conditions in Germany in 1988 and 1989 were good, with both the construction industry and automotive industry expanding. The automotive component industry was seeing signs of

a decrease in demand from domestic customers and only a small increase in exports. There was also a trend towards price reduction that favored large suppliers. In the construction supply industry, prices were stable.

## 1989 Transaction

In 1988, Prudential-Bache Capital Funding Group was authorized to solicit bids for the sale of Schlegel Corporation. Schlegel Corporation was implementing new contracts and was in need of additional capital to fund its business growth. Accordingly, Schlegel Corporation wanted to sell its stock to a company that could provide this additional capital. There were as many as six prospective buyers for Schlegel Corporation, including BTR Plc, Draftex, Pirelli/Metzler, Diversitech, Standard Products, and Continental.

At all relevant times, BTR Plc, a producer of a variety of rubber products, owned all of the stock of BTR International, Ltd. (BTR International), and BTR Secretaries, Ltd. (BTR Secretaries). All of these are U.K. companies. BTR Dunlop was a Delaware corporation wholly owned by BTR International, and, from January 1, 1987, through December 29, 1989, BTR Dunlop was the parent corporation of an affiliated group of corporations (the BTR affiliated group) that joined in filing a consolidated Federal income tax return.

BTR Dunlop was also interested in acquiring Schlegel Corporation because BTR Dunlop had a small sealing systems business that Schlegel Corporation fit into synergistically. BTR Dunlop submitted a bid to purchase Schlegel Corporation on December 12, 1988. BTRS Acquisition, a New York corporation, was formed on December 20, 1988, as a wholly owned subsidiary of BTR Dunlop, joining the BTR affiliated group. BTRS Acquisition subsequently purchased Schlegel Corporation on January 27, 1989, for $200 million plus the assumption of $33,864,000 in debt. Immediately thereafter, BTRS Acquisition merged into Schlegel Corporation pursuant to a merger agreement dated December 22, 1988. As a result, Schlegel Corporation became a wholly owned subsidiary of BTR Dunlop.

In January 1989, James Thom (Thom), treasurer of BTR Plc, contacted Robert Coyle (Coyle), director of taxation of BTR Dunlop, concerning the potential transfer of Schlegel UK and Schlegel GmbH to BTR Plc and BTR International. Thom asked Coyle to calculate the "tax cost" of the transfers, i.e., the Federal capital gain tax that would have to be paid in the event of these transfers. Shortly thereafter, Schlegel Corporation hired Valuation Research Corporation (VRC), an appraisal firm, to value the stock of Schlegel UK and Schlegel GmbH.

Assisting in the VRC valuation, Schlegel Corporation management prepared sales forecasts for the automotive and

building products divisions of Schlegel UK and provided them to VRC along with expense forecasts and historical financial data. From this information, VRC prepared a document entitled "Schlegel UK Projections" that projected continued profit growth for Schlegel UK.

VRC opined in a letter dated April 28, 1989, that the fair market value of Schlegel UK was $32,363,000 with a bargain purchase value of $21,846,000 and, in a separate letter dated April 28, 1989, indicated that the value of Schlegel GmbH was $3,777,000, exclusive of the silent partnership interest. After discovering certain clerical errors, VRC mailed a letter on September 15, 1989, that confirmed that the correct bargain purchase value of Schlegel UK was $21,846,000.

Accordingly, pursuant to a stock purchase agreement dated July 1, 1989, Schlegel Holding Company sold all of the stock of Schlegel UK to BTR Plc for $21,846,000. As of the date of sale, the Schlegel Holding Company's adjusted basis in Schlegel UK was $2,310,863. On November 30, 1989, Schlegel Corporation sold 99.9 percent of Schlegel GmbH to BTR International, .1 percent of Schlegel GmbH to BTR Secretaries, and its interest in the silent partnership to BTR International. Schlegel Corporation received $9,400,000 in consideration for this transaction. The adjusted tax basis, book value, and fair market value of the Schlegel Corporation's interest in the silent partnership was $5,116,136.

BTR Dunlop Holdings, Inc. (BTR Dunlop Holdings), a Delaware corporation, was formed on December 14, 1989, as a wholly owned subsidiary of BTR International. On December 30, 1989, BTR Dunlop Holdings acquired all of the stock of BTR Dunlop from BTR International and became the parent corporation of the BTR affiliated group.

On its 1989 Federal income tax return, petitioner reported the adjusted basis of Schlegel GmbH to be $9,400,000, including the silent partnership agreement. The Schlegel Corporation general ledger account for the period ended December 31, 1988, shows that Schlegel Corporation had a basis in Schlegel GmbH of $4,074,993. This amount did not include the $675,227 in subpart F interest income that Schlegel Corporation recognized from Schlegel GmbH in 1988.

Audit

On audit, respondent's revenue agent, Zygmunt Rachwal (Rachwal), reviewed the reported fair market values of Schlegel UK and Schlegel GmbH using the management-prepared sales projections for Schlegel UK from the VRC report and financial statements of Schlegel UK and Schlegel GmbH. Rachwal concluded that Schlegel UK should be valued at $49,069,000 and that Schlegel GmbH had a value of $13,246,000, including the silent partnership of $5,623,000.

Petitioner challenged this valuation with an appraisal of Schlegel UK prepared by Ernst & Young LLP (E&Y). In preparing its valuation report, E&Y used the management-prepared sales projections for Schlegel UK, concluding that the value of Schlegel UK was $15 million on a "stand-alone" basis. Rachwal, however, rejected the E&Y "stand-alone" valuation theory in favor of a "highest and best use" valuation. Rachwal did, however, revise his final valuation of Schlegel UK from $49,069,000 to $48,838,000 after adjusting for corporate overhead expenses and revising the applicable exchange rate. The notice of deficiency calculated gain based on the values determined by Rachwal of $48,838,000 for Schlegel UK and $13,246,000 for Schlegel GmbH.

## ULTIMATE FINDINGS OF FACT

On June 30, 1989, the fair market value of Schlegel UK was $31 million.

On November 30, 1989, the fair market value of Schlegel GmbH was $3.777 million, exclusive of the silent partnership interest.

## OPINION

Section 311(b) provides that, in the case of distributions of appreciated property to a shareholder, a corporation recognizes gain to the extent that the fair market value of the distributed property exceeds its adjusted basis in the hands of the distributing corporation. See Martin Ice Cream Co. v. Commissioner, 110 T.C. 189, 219-220 (1998). In the alternative,

respondent relies on section 482, which gives respondent broad discretion to allocate gross income, deductions, credits, or allowances between two related corporations if the allocations are necessary either to prevent evasion of taxes or to reflect clearly the income.  See Seagate Tech., Inc. & Consol. Subs. v. Commissioner, 102 T.C. 149, 163 (1994).  The applicable standard for making these allocations with respect to fair market value is arm's-length dealing between taxpayers unrelated by ownership or control.  See sec. 1.482-1A(b)(1), Income Tax Regs.  Accordingly, we are called upon to decide the fair market value of Schlegel UK and Schlegel GmbH on their respective valuation dates.

Respondent argues that, for purposes of section 311(b) and section 482, the value of Schlegel UK on July 1, 1989, was $49.8 million, that the value of Schlegel GmbH on November 30, 1989, was $8.4 million, exclusive of the silent partnership interest, and that petitioner's adjusted tax basis in Schlegel GmbH was $4,074,993 on the valuation date.  Respondent also argues that this determination is not arbitrary, capricious, or unreasonable pursuant to section 482.

Petitioner argues that, based upon the fair market value of the net assets of Schlegel UK, including goodwill and going-concern value, the fair market value of the stock of Schlegel UK on the valuation date was no more than $21,846,000, that the opinions of petitioner's experts independently establish the fair

market value of Schlegel UK, and that respondent's experts failed to analyze the facts and use the appropriate standard in determining the value of Schlegel UK. With respect to Schlegel GmbH, petitioner argues that the value of Schlegel GmbH stock on November 30, 1989, was $2.6 million because the company had no goodwill, few assets of value, and no prospect of growing its earnings in the period after the valuation date and that the basis of Schlegel Corporation in Schlegel GmbH was $4,750,220.

Valuation is a question of fact, and the trier of fact must weigh all relevant evidence on the date of valuation, without regard to hindsight, to draw the appropriate inferences. See Estate of Jung v. Commissioner, 101 T.C. 412, 423-424 (1993); Estate of Newhouse v. Commissioner, 94 T.C. 193, 217 (1990); Estate of Andrews v. Commissioner, 79 T.C. 938, 940 (1982). Future events foreseeable on the valuation date may be considered in deciding fair market value. See Estate of Newhouse v. Commissioner, supra at 218.

For Federal tax purposes, fair market value is the price that a willing buyer would pay a willing seller, both having reasonable knowledge of all of the relevant facts and neither being under compulsion to buy or to sell. See United States v. Cartwright, 411 U.S. 546, 551 (1973); 1.170A-1(c)(2), Income Tax Regs. The willing buyer and the willing seller are hypothetical persons, rather than specific individuals or entities, and the

peculiar characteristics of these hypothetical persons are not necessarily the same as the individual characteristics of an actual seller or an actual buyer. See Estate of Bright v. United States, 658 F.2d 999, 1005-1006 (5th Cir. 1981). The hypothetical willing buyer and willing seller are presumed to be dedicated to achieving the maximum economic advantage. See Estate of Newhouse v. Commissioner, supra at 218. This advantage must be achieved in the context of market and economic conditions on the valuation date. See id. The hypothetical sale should not be constructed in a vacuum isolated from actual facts that affect value. See Estate of Andrews v. Commissioner, supra at 956.

As is customary in valuation cases, the parties rely primarily on expert opinion evidence to support their contrary valuation positions. Opinion testimony of an expert is admissible if and because it will assist the trier of fact to understand evidence that will determine a fact in issue. See Fed. R. Evid. 702. We evaluate the opinions of experts in light of the demonstrated qualifications of each expert and all other evidence in the record. See Parker v. Commissioner, 86 T.C. 547, 561 (1986). We are not bound by the opinion of an expert witness, especially when such opinion is contrary to our conclusions. See IT&S of Iowa, Inc. v. Commissioner, 97 T.C. 496, 508 (1991). If experts offer divergent estimates of fair market value, we decide what weight to give these estimates by

examining the factors they used in arriving at their conclusions. See Casey v. Commissioner, 38 T.C. 357, 381 (1962). While we may accept an expert opinion in its entirety, Buffalo Tool & Die Manufacturing Co. v. Commissioner, 74 T.C. 441, 452 (1980), we may be selective in the use of any part of such opinion or reject the opinion in its entirety. Parker v. Commissioner, supra at 561. We may also reach a determination of value based on our own examination of the evidence in the record. See Estate of Davis v. Commissioner, 110 T.C. 530, 538 (1998). Finally, because valuation necessarily results in an approximation, the figure at which we arrive need not be directly attributable to specific testimony if it is within the range of value that may be properly arrived at from consideration of the evidence. See Silverman v. Commissioner, 538 F.2d 927, 933 (2d Cir. 1976), affg. T.C. Memo. 1974-285.

Respondent relies on the expert report of Alan C. Shapiro (Shapiro), a professor of banking and finance at the University of Southern California, Marshall School of Business, in valuing Schlegel UK and Schlegel GmbH. Petitioner relies on the expert reports of Lawrence B. Gooch (Gooch) of PricewaterhouseCoopers LLP and Kenneth R. Button (Button) of Economic Consulting Services, Inc., in valuing Schlegel UK and relies on the expert report of Wilfried Lahmann (Lahmann) of Schitag Ernst & Young in

valuing Schlegel GmbH.  Herbert T. Spiro testified as a rebuttal expert witness on behalf of petitioner.

Despite generally using the same methods of valuing the subject companies, the experts reached fair market value estimates that are extremely far apart.  The following chart lists the values at which the experts arrived:

|  | Shapiro | Button | Gooch | Lahmann |
|---|---|---|---|---|
| Schlegel UK | $49.8 million | $20 million | $21.7 million | -- |
| Schlegel GmbH* | 8.4 million | -- | -- | $2.6 million |

*exclusive of the silent partnership interest.

Schlegel UK

### Shapiro

Shapiro began his analysis by calculating the fair market value of Schlegel UK using the discounted cash-flow (DCF) method. The DCF method measures fair market value by calculating the present value of the stream of future cash-flows of a company. There are three components to the DCF method:  (1) The cash-flow projections for a forecasted period; (2) the terminal value; and (3) the appropriate discount rate.  Terminal value is calculated by adjusting cash-flows in the final period to represent the future cash-generating capability of the company.  This "normalized" cash-flow figure is then capitalized as a perpetuity by the previously determined discount rate, adjusted for some level of growth that can be expected to continue into perpetuity. The resulting terminal value is then discounted back to present

value using the discount rate.  Under the DCF method, the present value of the cash-flow projections and the terminal value are ascertained using the appropriate discount rate, and the sum of those amounts is the fair market value of the company.

The discount rate is calculated using the weighted average cost of capital (WACC) formula, which combines the after-tax costs of debt and equity into a weighted average overall cost of capital.  The cost-of-equity capital is equivalent to the long-term expected annual rate of return an investor seeks on an investment in stock.  It is calculated using the capital asset pricing model (CAPM).

One of the variables in the CAPM formula is beta, which measures the volatility in financial returns of a target firm. Beta is calculated by comparing the movement in the returns of a stock against the movement in the returns of the stock market as a whole, which has a beta of 1.  For example, if a stock generally increases 2 percent in price when the market increases by 1 percent, the stock would have a beta of 2 (2 divided by 1).

Shapiro calculated beta for Schlegel UK using the average beta from nine companies that he determined to be in a similar business as Schlegel UK.  The average beta for the nine companies was .87 with a range from .56 to 1.11.  Because Schlegel UK maintains relatively little debt in its capital structure, Shapiro then adjusted for the different degrees of debt leverage

associated with the guideline companies and Schlegel UK.  This process, referred to as unlevering, separates out the effects of debt financing and is necessary because higher debt levels generally lead to higher betas.  Accordingly, beta is unlevered to approximate the beta of a company that has no debt.  Shapiro then relevered the beta to take into consideration a 35-percent debt level based on VRC estimates of the Schlegel UK debt level in Rachwal's report.  Shapiro concluded that .84 was an appropriate beta for the CAPM calculation.

He also estimated the risk-free rate and the market risk premium using U.S. data, because he was of the opinion that a U.S. buyer would purchase Schlegel UK.  Based on these estimates, Shapiro concluded that a 13.8-percent WACC was an appropriate discount rate.  In his rebuttal report, Shapiro adjusted his beta to .5 based on calculations he made with petitioner's beta guideline companies.  He used that beta, the same risk-free rate, and the U.K. market risk premium, concluding that the adjusted WACC discount was 14.57 percent.

Shapiro used VRC sales forecasts as reproduced in the Internal Revenue Service (IRS) engineer's report to calculate free cash-flows and the appropriate terminal value of Schlegel UK.  For cash-flows, Shapiro calculated earnings before depreciation, interest, and taxes (EBDIT), using the historic rate of EBDIT from 1987 through June 30, 1989, and applied it to

the sales forecasts.  He then reduced EBDIT by a 1.3-percent corporate overhead expense, the depreciation, and the capital expenditures from the E&Y report. He also adjusted for the corporate tax rate.

Shapiro calculated terminal value using a projected growth rate in cash-flows of 6 percent, while also taking into consideration expected inflation of approximately 4 percent and economic growth of about 2 percent.  He arrived at a terminal value of $88.26 million.

Applying the discount rate from his original report and his rebuttal report to his cash-flow projections and terminal value, Shapiro concluded that the fair market value of Schlegel UK under the DCF method on the valuation date was $52.2 million and $49.8 million, respectively.

As a "sanity check", Shapiro also valued Schlegel UK using several market multiple methods.  First, Shapiro selected seven companies that manufactured rubber products for automobiles and buildings and were involved in acquisitions in similar industries around the same time as the sale of Schlegel UK.  Shapiro then calculated market multiples from the available data of purportedly comparable companies and applied those multiples to the financial data of Schlegel UK, arriving at the following fair market values:

| Multiple | Comparable Average | Schlegel UK Value |
|---|---|---|
| Market value/sales | 1.03 | $62,280,000 |
| Market value/book value | 1.68 | 12,374,000 |
| Market value/EBITDA* | 9.73 | 59,559,000 |
| Market value/EBIT* | 13.48 | 64,987,000 |
| Market value/EBI* | 18.17 | 55,238,000 |
| Average value | | $50,888,000 |

*E=Earnings; I=Interest; T=Taxes; D=Depreciation; A=Amortization.

Shapiro then applied this same approach to eight publicly traded companies. The principal difference between the two approaches is that comparison to publicly traded companies values Schlegel UK as a stand-alone company, whereas the preceding approach valued Schlegel UK as an acquisition target. The results from the publicly traded market multiple analysis are as follows:

| Multiple | Comparable Average | Schlegel UK Value |
|---|---|---|
| Market value/sales | 0.84 | $50,262,000 |
| Market value/book value | 1.36 | 9,152,000 |
| Market value/EBITDA | 7.46 | 44,565,000 |
| Market value/EBIT | 11.11 | 52,729,000 |
| Market value/EBI | 13.09 | 38,488,000 |
| Average value | | $39,039,000 |

Lastly, Shapiro used the sale of Schlegel Corporation for $233.2 million as a market comparable applying the market multiples from Schlegel Corporation to the financial data of Schlegel UK in arriving at an average value of $41.338 million.

According to Shapiro, because the various comparable methods ignore a variety of relevant economic factors, including asset turnover, profit margins, sales growth, return on investment, and working capital requirements, he assigned more weight to the DCF method. He concluded that the value of Schlegel UK was $52.2 million in his original report but changed his conclusion to $49.8 million based on adjustments made in his rebuttal report.

### Button

Button also used the DCF method to value Schlegel UK. In calculating the cost-of-equity capital, Button used five guideline companies to calculate unlevered beta, and he relevered beta based on the median debt-to-equity ratio of the guideline companies, 24.8 percent, to reflect the debt-equity ratio that Schlegel UK would have as an independent entity.

In arriving at his final cost-of-equity capital, Button also applied a small company risk premium and company-specific risk premium. Button claimed that studies show that the CAPM does not fully capture the risk associated with small companies. Accordingly, he contends that it is appropriate to incorporate a small company risk premium in the discount rate to reflect the additional risk of small companies such as Schlegel UK. Button adjusted his CAPM analysis to include a small company risk premium of 5.7 percent. Button also maintained that a company-

specific risk premium adjusts the cost-of-equity capital for the relative riskiness of the company compared to the guideline companies in terms of either quantitative or qualitative factors. Button opined that, based on aggressive sales projections, operational problems, lack of diversity, inadequacy of management resources, and lack of access to adequate capital, Schlegel UK was more risky than the guideline companies that were used in the valuation analysis. Thus, he added a 1-percent company-specific risk premium to the cost-of-equity capital in coming to a cost-of-equity capital of 28.77 percent. Button concluded that the appropriate WACC was 24.75 percent.

Button forecasted Schlegel UK cash-flows based on information obtained from Schlegel UK documents and discussions with management in 1998 or 1999 about expectations existing during the first half of 1989 regarding the period after the valuation date. He prepared cash-flow projections for the automotive division and the building materials division separately, using the sales projections that were used by Rachwal, E&Y, and Shapiro. He stated that the building products forecast was based on unrealistically optimistic assumptions about sales growth because he anticipated a decline in housing starts and other sales, but he concluded that the construction of an alternative sales forecast was not feasible. He viewed the automobile division forecasts as reasonable, although management

stated 10 years later that little credibility was given to those projections in 1989.

Button projected expenses, including materials, labor, overhead, royalty, depreciation, taxes, capital expenditures, and depreciation, based on historical ratios from January 1987 to June 1989. He also took into consideration change in working capital in arriving at the cash-flow estimates. The cash-flow estimates for the building materials and automotive divisions were ultimately combined. He calculated terminal value using the 24.75-percent discount rate and a growth rate of 6.9 percent. He concluded that the terminal value of Schlegel UK was $33.554 million.

Applying the 24.75-percent discount rate to the projected cash-flows and terminal value of the Schlegel UK automotive and building products divisions, Button concluded that the controlling interest value of Schlegel UK was $19 million; however, Button also was of the opinion that a discount for lack of marketability was necessary because the DCF method calculates the value of a publicly traded company. Thus, Button applied a 16.3-percent lack-of-marketability discount to value Schlegel UK as a privately held company, concluding that the fair market value was $16 million.

Button also used the market multiple approach to value Schlegel UK; however, he relied only on the price/earnings and

price/cash-flow ratios.  He calculated these ratios using five

guideline companies and made adjustments similar to those made

under the DCF method for small company risks and company-specific

risks.  He arrived at the following market multiples:

| Multiple | Most Recent Year | 3-year Average |
|----------|------------------|----------------|
| Price/earnings | 5.55 | 6.63 |
| Price/cash-flow | 4.24 | 4.73 |

Button applied those multiples to Schlegel UK data from

1988, to the average of the Schlegel UK three most recent fiscal

years (1986-1988), and to a blend of one-half of 1988 and the

first half of 1989.  The results of these calculations valued

Schlegel UK from $14 million to $22 million.  Button then applied

a 16.3-percent discount for lack of marketability and a control

premium of 35 percent, arriving at a range of values from

$16 million to $25 million.  In light of all of the information

and specific circumstances of Schlegel UK, Button concluded that

the most appropriate value under the market approach was

$21 million.  Button indicated in his report that the asset

valuation approach was not appropriate and that Schlegel UK

should not be adjusted to take into consideration synergies.

Assessing the values determined under the DCF method and the

market multiple approach, Button concluded that both estimates

provided useful information in determining the value of the

company, but he placed greater emphasis on the market multiple

approach because the DCF method required a greater number of estimates. Accordingly, Button concluded that Schlegel UK had a fair market value of $20 million as of July 1, 1989.

### Gooch

Gooch also valued the Schlegel UK automotive and building products groups separately, taking into consideration the differences between the industries. His valuation, however, departed from Button's approach in that Gooch valued Schlegel UK on both a synergistic and stand-alone basis.

Applying the DCF method, Gooch calculated a WACC using an industry-wide beta estimate for the automotive and building products operations of Schlegel UK to calculate cost-of-equity capital. Gooch was of the opinion that the beta of individual companies is often unreliable due to speculation, low trading volume, or other factors affecting stock price besides earnings. Based on his industrywide research, he concluded that the appropriate beta for companies operating in the automotive sector was in the range of 1.05 to 1.45 with an average of 1.2 and that the appropriate beta for companies in the building products sector ranged from 1.1 to 1.8 with an average of 1.3. He ultimately used 1.3 and 1.5, respectively.

Gooch applied a small company risk premium of 5 percent to both the automotive and building products divisions when calculating the cost-of-equity capital. Gooch also perceived

there to be a greater risk in the Schlegel UK automotive segment due to the competitive nature of winning business for new models and Schlegel UK reliance on Rover and Ford for a majority of its revenue.  Due to this concern, Gooch also chose to apply a company-specific risk premium of 2 percent to the automotive division.  No such adjustment was made with respect to the building products division.

For the automotive group, Gooch calculated his projected synergistic cash-flows from financial forecasts developed by the managers of Schlegel UK.  He made adjustments to these projections based on his 1998 or 1999 discussions with management and his overall view of the automotive industry in the United Kingdom during those years.  He also took into consideration the potential close of the Leeds plant in early 1989.  Gooch concluded that the stand-alone scenario was slightly less profitable than the synergistic scenario.

With respect to the building products division, Gooch noted that there had been rapid growth over the mid- to late 1980's in the housing industry; however, Gooch found that there had been a drop in house building starts in early 1989 and the likelihood of reduced sales of other Schlegel UK building products.  Thus, he reduced the building product projections for stand-alone projects, while adjusting for higher sales under the synergistic approach for economies achieved from synergies.

In estimating expenditures, Gooch analyzed historic royalties, capital expenditures, and overhead and had some discussions with Schlegel UK management.  Gooch determined from this analysis that the royalty rate for the automotive group was 3 percent of sales, that the royalty rate for the building products group was 3.2 percent of sales, and that capital expenditures should be 4.5 percent and 2.3 percent for the automotive and building products divisions, respectively.  He also calculated a terminal value of $47.648 million.  Applying the WACC discount rate to the sales projections and terminal value, Gooch arrived at a synergistic value of $24.18 million and a stand-alone value of $17.05 million.

Gooch also used the market multiple approach to value Schlegel UK, focusing on the market value of invested capital (MVIC) as the primary indicator of value.  MVIC is the sum of the market value of the common stock of a comparable company, the market value of the interest-bearing debt of the comparable company, and the preferred stock.  Gooch calculated the following market multiples using nine purportedly comparable companies:

| Multiple | Comparable Average | Comparable Median | Selected Multiple |
|---|---|---|---|
| MVIC/sales | 0.70 | 0.62 | 0.65 |
| MVIC/EBITDA | 5.50 | 5.42 | 5.50 |
| Market value/EBIT | 7.05 | 7.13 | 7.00 |
| Price/adjusted Net income | 10.33 | 10.78 | 10.50 |

Gooch adjusted Schlegel UK royalties, central management overhead, and additional charges before applying the multiples to Schlegel UK operating results. He gave more weight to the results from the EBITDA and EBIT multiples because he considered them to be more stable. He then applied a control premium to the results of the market multiple comparison to take into consideration synergies of a potential buyer, arriving at a value of $23,870,000. Gooch concluded that the stand-alone value of Schlegel UK was $20,350,000, applying no control premium.

Finally, Gooch applied an underlying asset approach to valuing Schlegel UK. He indicated that the net working capital as of June 30, 1989, was $6.82 million and that fixed assets had a book value of approximately $10.85 million. At the end of 1989, fixed assets were written up to $19.84 million. After adjustments for debt and timing issues, Gooch estimated that the value was more likely to be restated to $19.22 million. In view of the values derived from the income and market approaches, Gooch stated that the liquidation value was a less reliable indicator because the other approaches seemed to produce higher values. Gooch gave equal weight to the synergistic and stand-alone values from the various approaches set forth above, concluding that the fair market value of Schlegel UK was $21.7 million.

Schlegel GmbH

### Shapiro

Shapiro used the same valuation methods set forth above in valuing Schlegel GmbH. He calculated a cost-of-equity capital of 11.21 percent and a WACC of 8.46 percent. Applying this discount rate to the IRS engineer cash-flow projections that were derived from the VRC projections, Shapiro calculated a value for Schlegel GmbH of $10 million, independent of the silent partnership.

Shapiro verified this amount using the market multiple approaches described above. Application of the comparable company market multiple analysis to Schlegel GmbH resulted in an estimated value of $10.4 million. Shapiro noted, however, that this valuation was more conjectural because the underlying data were subject to some degree of error. In particular, it was necessary to translate German financial statements and discern the meanings of various terms and accounts. The market multiple analysis from publicly traded comparables resulted in a value of $7 million. Shapiro's ultimate conclusion was that Schlegel GmbH had a value of $10 million, exclusive of the silent partnership; however, he made adjustments in his rebuttal report, restating the value to be $8.4 million.

## Lahmann

Lahmann valued Schlegel GmbH, attempting unsuccessfully to identify comparable third-party transactions. Thus, he determined the fair market value based on the sustainable profits of the company at the valuation date. He projected the sustainable profits in perpetuity after November 30, 1989, by adjusting the recorded annual profits by extraordinary expenses and income relating to transactions that were not part of the business of Schlegel GmbH at the valuation date. German income taxes (i.e., trade tax on income and corporation taxes) were deducted from the adjusted profits as the final component of the calculation. Lahmann's projections were then discounted to their present value using a discount rate that was composed of the long-term interest rate for risk-free Government bonds (7.6 percent) reduced by the German corporation tax rate of 36 percent on distributed profits. The resulting adjusted discount rate of 4.86 percent was increased by the following risk elements: A market risk premium of 5.3 percent for general business risk (based on empirical investigation in Germany), a small company risk premium of 2 percent, and a 1-percent specific-company risk premium because Schlegel GmbH could potentially be held liable for soil contamination. The overall discount rate was 13.16 percent. The application of this

discount rate to the sustainable profits resulted in a fair market value for Schlegel GmbH of $2.6 million.

Valuation Analysis and Conclusions

Petitioner argues that we should value the subject companies using an asset valuation method; however, in valuing the stock of operating companies, primary consideration is generally given to the earnings of the company. See Estate of Huntsman v. Commissioner, 66 T.C. 861, 876 (1976) (citing Levenson's Estate v. Commissioner, 282 F.2d 581, 586 (3d Cir. 1960), affg. on this issue T.C. Memo. 1959-120); see also Rev. Rul. 59-60, 1959-1 C.B. 237, 242. Asset valuation is accorded the greatest weight in valuing the stock of a holding company. See Levenson's Estate v. Commissioner, supra at 586. Schlegel UK and Schlegel GmbH are operating companies, and the experts in this case focused on the earning potential in arriving at fair market value. The experts also indicated that the asset methodology is inappropriate because it undervalues the subject companies. Accordingly, we focus on the earning power to arrive at fair market value, giving little weight to the value of the assets of the companies.

We focus initially on whether Schlegel UK should be valued as a stand-alone entity or as an entity likely to be acquired by a company with synergies. Button valued Schlegel UK on a stand-alone basis because he was of the opinion that no synergistic buyer was available for Schlegel UK. Gooch considered the

potential for a synergistic buyer, concluding that synergies only increased the value of Schlegel UK by a small amount. Shapiro was of the opinion that Schlegel UK should be valued as if it would be purchased by a synergistic buyer.

The fair market value of property should reflect the highest and best use to which the property could be put on the date of valuation. See Stanley Works & Subs. v. Commissioner, 87 T.C. 389, 400 (1986). Petitioner, relying on the expert report of Gooch, argues that the likelihood of a synergistic buyer's purchasing Schlegel UK was no greater than a stand-alone scenario, but petitioner maintains that it considered both scenarios in arriving at the fair market value for Schlegel UK.

We are not persuaded that petitioner adequately considered the potential for synergies in valuing Schlegel UK. There were six potential synergistic buyers of Schlegel UK. Yet, petitioner's application of the DCF method and market multiple approach relied significantly on a small company risk premium, a company-specific risk premium, and numerous cash-flow assumptions more appropriate for a stand-alone valuation. Button did not value Schlegel UK with synergies, and, when Gooch purportedly valued Schlegel UK with synergies, he used the same revenue projections he used in the stand-alone analysis and did not make the necessary adjustments to the discount rate to reflect the benefits of synergies. A synergistic buyer would not only

achieve cost savings but would also increase sales. When asked during trial if he would sell Schlegel UK at the value at which he arrived from his calculations, Gooch responded: "I probably wouldn't have sold it [for $21 million] because it was worth more to me, the seller, yes. I probably would not have sold it for that." Accordingly, we reject petitioner's proposed valuation of Schlegel UK as not the value at which the company would have changed hands between a willing seller and a willing buyer. Reliance solely on a stand-alone value and application of the small company risk premium and company-specific risk premium are not justified by the evidence in this case.

We also disagree with respondent's proposed valuation because too much reliance is placed on the synergistic valuation of Schlegel UK, resulting in an unrealistically high value. In selecting beta for the DCF calculation in his original report, Shapiro selected a low beta, and, in his rebuttal report, he actually used a beta of .5 that was below the range of betas for purportedly comparable companies. He also did not address the appropriate royalty rates or properly consider the economic conditions in the United Kingdom on the valuation date. Just as determination of fair market value requires assumption of a willing seller, it does not assume hypothetical transactions that are "unlikely and plainly contrary to the economic interests" of a hypothetical buyer. See Estate of Hall v. Commissioner, 92

T.C. 312, 337 (1989) (quoting Estate of Curry v. United States, 706 F.2d 1424, 1429 (7th Cir. 1983)); see also Estate of Newhouse v. Commissioner, 94 T.C. 193, 232 (1990). We are not persuaded that buyers exist who would be willing to pay the value asserted by Shapiro.

The experts' selection of comparable companies with respect to the market multiple estimates failed to consider objective guideposts of comparability. In addition, petitioner's experts made extensive adjustments based on hindsight as to matters occurring subsequent to the valuation date. Some of these adjustments were based on interviews with petitioner's employees and representatives 10 years after the valuation date and in anticipation of trial. Certain of the employees also testified at trial. Their testimony was not corroborated by contemporaneous records and thus appears to exaggerate 1989 adverse conditions and problems. The adjustments made were inconsistent with assumptions used at the time of the transaction. Such adjustments are susceptible to manipulation for the purpose of achieving the result sought by the party, and they are unreliable in this case. Shapiro, on the other hand, did not sufficiently investigate the specific circumstances of the company in 1989. Consequently, we do not rely completely on the opinion of any of the experts and must do the best we can

with the compilations of data and explanations that each provided.

In valuing Schlegel GmbH, Lahmann and Shapiro actually calculated comparable discount rates. The assumed cash-flows and sustainable profits, however, varied to such an extent that the resulting fair market value estimates differed by approximately $5.8 million. Evaluating the reports, we agree with respondent that the contemporaneously prepared sales projections are the most appropriate starting point for cash-flows, but Shapiro again failed to investigate or to consider adequately specific facts relating to Schlegel GmbH known at the valuation date. When asked at trial whether a prospective buyer would have used his methodology or would have visited the facility and talked to the people involved in the business, Shapiro stated that "they would--they would go--they should certainly go out and talk to the people there, try to uncover any hidden problems that might exist."

Shapiro and Button used the management-prepared sales projections in making their cash-flow estimates for Schlegel UK, and the results of their cash-flow analyses are comparable. The primary difference in their fair market value conclusions is attributable to the discount rate and terminal value that each calculated.

Shapiro used the WACC formula, concluding that the discount rate was 14.57 percent. Button used the same formula in arriving at his discount rate estimate of 24.75 percent. However, as we indicated above, the beta that Shapiro used was too low, and Button erroneously incorporated a small company risk premium and a company-specific risk premium that elevated the discount rate to an unreasonably high level. Substituting a beta of 1.18 into Shapiro's calculation and subtracting out the small company risk premium and company-specific risk premium used in Button's calculation, we arrive at a discount rate of approximately 20 percent. Applying that discount rate to Button's and Shapiro's cash-flow estimates and calculating terminal value for each, fair market values of $31.577 million and $30.811 million, respectively, are indicated. Taking into consideration the inherently imprecise nature of valuation, we conclude and find as a fact that, based on all of the factors set forth herein and on the entire record, the fair market value of Schlegel UK was $31 million on the valuation date.

Petitioner reported a $9.4 million fair market value for Schlegel GmbH on its 1989 Federal income tax return. This amount was the sum of the fair market value of the silent partnership, $5.623 million, now stipulated to be $5,116,136, and the $3.777 million VRC fair market value estimate for Schlegel GmbH. Petitioner now contends that the fair market value of Schlegel

GmbH was $2.6 million on the valuation date, relying on the expert report of Lahmann. The reported values in petitioner's return are admissions by petitioner. A lower value cannot be substituted at this point without cogent proof that the reported values were erroneous. See Estate of Hall v. Commissioner, supra at 337-338. For the reasons indicated above, we are not persuaded by Lahmann's use of hindsight, nor are we persuaded by respondent that the fair market value should be increased. Accordingly, the fair market value of Schlegel GmbH on the valuation date, exclusive of the silent partnership interest, was $3.777 million.

Adjusted Basis of Schlegel GmbH

The parties also disagree as to the adjusted basis of Schlegel GmbH. Respondent maintains that the adjusted basis is $4,047,993, and petitioner argues that the adjusted basis should also include interest income of $675,227 that Schlegel GmbH reported on its 1988 tax return pursuant to section 951.

Section 961 provides that the basis of a U.S. shareholder's stock in a controlled foreign corporation is increased by the amount included in the shareholder's gross income under section 951. Section 961(b), however, provides that the basis of such stock shall be reduced by the amount actually received and excluded from gross income of the U.S. shareholder under section 959. Schlegel Corporation included $675,227 of interest income

from Schlegel GmbH in its gross income for 1988 pursuant to section 951. Basis, therefore, depends upon whether this amount was actually distributed to Schlegel Corporation before November 30, 1989.

The Schlegel Corporation general ledger reflected that Schlegel Corporation had an adjusted basis in Schlegel GmbH of $4,047,993 at the end of 1988. This amount reflects a reduction in basis under section 961(b) for the amount of the interest income reported in 1988, which in turn assumes that the distribution was made prior to November 30, 1989, and excluded from Schlegel Corporation income under section 959. Petitioner challenges the account balance shown on the ledger, claiming that the distribution of interest income was not made, but then petitioner relies on the absence of a ledger entry recording the distribution and vague testimony suggesting, but not establishing, that no distribution in fact was made. Due to the ambiguous and unreliable nature of the books and testimonial evidence, petitioner has failed to prove that it is entitled to additional basis in Schlegel GmbH over that reflected in the general ledger account of Schlegel Corporation at the end of 1988.

We have considered the other arguments of the parties.  Our resolution of the valuation issues renders discussion of alternative arguments unnecessary.

<u>Decision will be entered under Rule 155.</u>